# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| OCTAVE SCHULLY | CIVIL ACTION |
| VERSUS | NO. 07-1456 |
| CONTINENTAL CASUALTY COMPANY, ET AL. | SECTION "L" (3) |

## ORDER & REASONS

This matter came on for trial before the Court on the administrative record. After hearing oral argument and studying the parties' briefing, the administrative record, and the relevant law, the Court is now prepared to rule as follows.

## I.    FACTUAL BACKGROUND

This case arises out of a dispute over the denial of health benefits to the Plaintiff, a former managing partner of a local oil and gas law firm. Continental Casualty Company provided insurance coverage to Plaintiff's employer under Group Policy Number SR-83099399 for the long-term disability plan ("the plan"). Plaintiff's long-term disability insurer, the Hartford Life Group Insurance Company ("the Hartford"), acted as administrator for the disability plan, which falls within the definition of an Employee Welfare Benefit Plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*. Under ERISA, "a person denied benefits under an employee benefit plan [may] challenge that denial in federal court." *Metropolitan Life Ins. Co. v. Glenn*, --- U.S. ---, 128 S.Ct. 2343, 2346, 171 L.Ed.2d 299 (2008) (citing 29 U.S.C. § 1001, *et seq.*, 29 U.S.C. § 1132(a)(1)(B)). On March 27, 2007, Plaintiff filed suit against the Hartford under ERISA seeking reinstatement of past and future physical disability benefits. The facts of Plaintiff's challenge to the Hartford's denial of

his claim for benefits are as follows.

In 1997, Plaintiff, then forty-two years old, was employed as a managing partner of Schully, Roberts, Slattery & Marino, a New Orleans-based oil and gas law firm that he co-founded. Plaintiff's primary job duties ranged from handling complex financial transactions for oil and gas, industrial, and commercial business entities, to overseeing numerous internal administrative issues, such as firm management, client development, and marketing obligations. Plaintiff's professional time commitments were extensive, and he frequently worked in excess of fifty hours per week.[1]

In late 1997, Plaintiff awoke one morning with significant neck pain that radiated down into his shoulders, back, and upper extremities. According to Plaintiff, the condition severely limited his mobility and even turning his head would result in pain and numbness to his neck, shoulders, and arms. Plaintiff initially sought treatment for his condition with Dr. Lee Moss, an

---

[1]Plaintiff's law firm described his primary job duties as follows:

> Mr. Schully is an attorney-at-law and major shareholder of Schully, Roberts, Slattery Jaubert & Marino, APLC. In both of these capacities, Mr. Schully's duties require not only his undivided attention and presence in the office during the workweek; but also during evening and weekend hours. As an attorney, Mr. Schully's practice area is financial transactions for commercial entities. Mr. Schully's practice requires his continuous and undivided attention to both the broad scope and transaction minutiae of the contract, corporate, and financial documents that encompass the large, multi-million dollar loans in which Mr. Schully represents local, regional, national and multi-national businesses and financial institutions. As a major shareholder in the Firm, Mr. Schully's duties include extensive client development, presentations and speeches, and extensive and continuous interaction with the attorneys and staff of the Firm.

H-0517.

orthopedic surgeon, and Dr. Richard Corales, a neurosurgeon.[2]  After conducting several initial physical examinations, Dr. Corales diagnosed Plaintiff's condition as C7 radicular syndrome resulting from a flagrant C7 nerve root encroachment from a herniated disc.[3]  Following a prolonged but ultimately unsuccessful course of conservative treatment, including medication for pain management, Dr. Corales eventually recommended that Plaintiff undergo cervical fusion surgery.

On November 20, 2000, Dr. Corales performed cervical surgery with an anterior discectomy and fusion at C6-7.[4]  Following the surgical procedure, Dr. Corales reported that Plaintiff showed some improvement, "with most of his symptoms being on his right triceps."[5]  Although Plaintiff's pain in his upper extremities had improved somewhat, Plaintiff continued to report intermittent pain and limited mobility.[6]  Plaintiff's general condition continued to improve until "he had a collapse of his bone plug which caused some disc space collapse and some neural forminal stenosis," at which time he reported increased pain in his neck, back, and upper extremities.[7]

On October 21, 2001, Plaintiff was involved in an automobile accident in which his car

---

[2]H-0593.

[3]H-0808.

[4]*Id.*

[5]*Id.*

[6]H-0593.

[7]*Id.*

was rear-ended and spun around.[8]  Although Plaintiff did not lose consciousness during the accident, he reported that his head had forcibly struck against something in the interior of the vehicle.[9]  Plaintiff did not seek emergency treatment immediately following the collision, but he later reported increased pain and reduced mobility in his neck, lumbar spine, and upper extremities that seemed to be "greater in magnitude than his normal pre-injury level."[10]

Following the collision, Plaintiff again sought treatment with Dr. Corales, who obtained updated cervical and lumbar MRIs, as well as a cervical myelogram and post-myelogram CAT-scan of the Plaintiff's spine.  The tests revealed that the Plaintiff was suffering from "C7 radiculopathy from neural foraminal stenosis at the C7 interspace."[11]  Given these findings, Dr. Corales initially prescribed a conservative treatment of prescription pain-management medications, including Neurontin, Medrol, and Dosepak.[12]  In addition, Dr. Corales referred Plaintiff to Dr. Patrick Waring, a pain-management specialist, for a series of epidural steroid injections.

On May 3, 2002, Dr. Waring reported that an MRI of Plaintiff's lumbar spine revealed left L1-L2 disc pathology.[13]  In consideration of both his findings and Plaintiff's reported symptoms, Dr. Waring administered a flouroscopic two-level lumbar transforaminal epidural

---

[8]H-0593; H-0816.

[9]H-0593; H-0816.

[10]H-0593; H-0816.

[11]H-0808.

[12]*Id.*

[13]H-0765.

steroid injection at the left L1 and L2 levels.[14]  After completing the injection, Dr. Waring noted that Plaintiff "tolerated the procedure well and was discharged in approximately one hour in excellent condition with full recovery of sensory and motor function."[15]

On May 24, 2002, Dr. Waring treated Plaintiff for a follow-up visit and successive epidural injection.[16]  During the follow-up appointment, Plaintiff reported that his condition had improved somewhat since the first injection.  Dr. Waring administered a second flouroscopic two-level lumbar transforaminal epidural steroid injection at the left L1 and L2 levels.[17]  Plaintiff was again released approximately one hour after the injection in good condition with full recovery of sensory and motor function.[18]

Despite Plaintiff's short-term improvement from the epidural steroid injections and prolonged conservative care, Dr. Corales began to notice that Plaintiff's overall condition was worsening, with increasing pain and additional loss of mobility.  In particular, Dr. Corales observed that Plaintiff had developed a "very mechanical impingement syndrome where every time he turns his head to the right, he gets C7 nerve root symptoms."[19]  Dr. Corales also noted "a positive right Spurling sign, which gives marked C7 radicular-like symptoms [and is] more

---

[14]*Id.*

[15]*Id.*

[16]H-0743.

[17]*Id.*

[18]*Id.*

[19]H-0808.

positive than it has been in the past."[20]  Given these findings, Dr. Corales eventually

recommended a second cervical surgery for decompression of Plaintiff's C7 nerve root to

address Plaintiff's increasing pain and functional limitations.[21]

On November 25, 2002, Dr. Corales performed a right C6-7 laminotomy and

foraminotomy for decompression of the C7 nerve root from the posterior approach.[22]  Following

the surgical procedure, Dr. Corales scheduled several follow-up visits to monitor Plaintiff's

condition.  In addition, Dr. Corales prescribed Vicodin to address Plaintiff's residual pain and

functional limitations.[23]  Despite having undergone two cervical surgeries and a number of

epidural steroid injections over a period of two years, however, Plaintiff continued to report

severe pain and limited mobility in his cervical, upper extremity, and lumbar areas.[24]

On March 17, 2003, Dr. Corales noted that Plaintiff had become "demoralized" and

depressed by the two unsuccessful surgeries and his ongoing pain and functional limitations.[25]

According to Dr. Corales, Plaintiff's overall condition appeared to be deteriorating.  Soon

thereafter, Plaintiff began more extensive treatment with mental health professionals and

reported that, in addition to his residual back and neck pain, he was also experiencing

_____

[20]*Id.*

[21]H-0808; H-0813.

[22]H-0808.

[23]H-0796.

[24]H-0784.

[25]*Id.*

-6-

debilitating feelings of anxiety, depression, and hopelessness.[26]

On May 17, 2003, Plaintiff effectively ceased working and filed a claim for both mental and physical disability benefits with the Hartford. After reviewing Plaintiff's application, the Hartford accepted Plaintiff's claim for mental disability benefits but denied his claim for physical disability benefits. Under the terms of the Hartford plan, a plan participant may receive physical disability benefits for an indefinite period of time but may only receive mental disability benefits for a maximum of two years. The Hartford permitted Plaintiff to submit additional medical evidence to support his claim for physical disability benefits if he wished to appeal the plan administrator's decision. At that time, however, Plaintiff did not appeal the decision or submit any additional material in support of his claim.

The Hartford paid Plaintiff disability benefits for a period of twenty-four months, the maximum amount of time that a plan participant may receive benefits for mental disability under the policy. During that period, Plaintiff continued to receive medical treatment for both his physical pain and his mental depression and anxiety. Plaintiff pursued psychiatric treatment with Ms. Beth Breese, a licensed clinical social worker and psychopathologist, and Dr. Kathleen Barfoot, a board-certified psychiatrist.

On July 17, 2003, Ms. Breese submitted to the Hartford a physician's statement and addendum describing her observations of Plaintiff over the course of treatment.[27] Ms. Breese noted that she had been treating Plaintiff in psychotherapy on and off since 1997, when his ex-

---

[26]*Id.*

[27]H-0524; H-0526.

wife had sued him for divorce.[28]  According to Ms. Breese, Plaintiff had rapidly changed "from a

highly successful attorney to a person who is now completely incapable of working."[29]  Ms.

Breese reported that Plaintiff had attempted to return to work but could only "sit at [his] desk

engulfed in anxiety and obsessive thinking, which then 'snowballs into a panic attack.'"[30]

Although attending to Plaintiff's physical symptoms fell outside the course and scope of Ms.

Breese's medical training, she did note that Plaintiff suffered from "back pain which limits

strenuous physical activity."[31]  Ms. Breese stated that, in her opinion, Plaintiff would need to

take a leave of absence from work of at least one year if not longer, as he would likely require

additional treatment "for quite a long time."[32]

On August 7, 2003, Dr. Barfoot completed a psychiatric consultation and evaluation of

Plaintiff's condition for submission to the Hartford.[33]  Dr. Barfoot noted that Plaintiff reported

sharp pain at the "low cervical, upper thoracic area, radiating to the sides, right greater than left

and occasionally into the right upper extremity down to the elbow medially."[34]  After conducting

a physical examination, Dr. Barfoot observed that Plaintiff's symptoms were compatible with

---

[28]H-0526.

[29]*Id.*

[30]*Id.*

[31]H-0525.

[32]H-0528.

[33]H-604.

[34]H-0605.

mild right cervical radiculopathy.[35]  Dr. Barfoot noted the presence of low back pain, likely

discogenic, without clear evidence of lumbar radiculopathy.[36]  Dr. Barfoot scheduled a follow-up

visit and recommended that the Plaintiff attempt a trial of formal physical therapy.[37]

On November 10, 2003, Ms. Breese completed a functional assessment of Plaintiff's

condition, noting that Plaintiff "cannot do anything pertaining to his law practice....  He cannot

even sit at his desk long enough to complete a task, must pace instead."[38]  At that time, Ms.

Breese estimated that, based on Plaintiff's anxiety and depression, Plaintiff would not be able to

return to work for at least one year, perhaps two years.[39]  Included with Ms. Breese's report are

notes from several of Plaintiff's therapy sessions.  On August 14, 2003, Ms. Breese recorded the

following notes of her meeting with Plaintiff:

> Has been going fishing!! Seems almost like a little boy who has just
> learned a new skill.  Fishing in the early morning on the 14th he was
> having so much fun forgot his session at noon.  And so came in in his
> fishing clothes, apologetic of course.  I congratulated him on
> allowing himself to appear in my office dressed that way.[40]

On November 20, 2003, Dr. Lincoln Paine, a psychiatrist, evaluated Plaintiff's condition

and completed a functional assessment tool for submission to the Hartford.[41]  During the

---

[35]H-0607.

[36]*Id.*

[37]*Id.*

[38]H-0358.

[39]*Id.*

[40]H-0360.

[41]H-0377.

examination, Dr. Paine noted that Plaintiff "continues to be extremely anxious and, though concerned about returning to work, has so much difficulty concentrating that he could not function as a lawyer."[42] Dr. Paine further noted that Plaintiff reported "feeling worthless, concern about not working, can't concentrate ... has had pain."[43] In addition, Dr. Paine also stated that Plaintiff "does not have physical limitations."[44] Given these findings, Dr. Paine estimated that Plaintiff would be able to return to work in "1-2 years," though he was unable to provide a specific date for the return.[45]

On December 14, 2003, Dr. Barfoot conducted a follow-up visit and examination of Plaintiff.[46] Dr. Barfoot noted that Plaintiff reported continued neck pain radiating down into the right arm.[47] Dr. Barfoot further observed that Plaintiff seemed "reasonably comfortable while seated," despite evidence of "some mildly tight muscle areas at the cervical paraspinals and trapezius muscles, but only minimally."[48] In consideration of her findings, Dr. Barfoot prescribed Plaintiff additional medication for pain management and recommended that he continue to participate in formal physical therapy.[49]

---

[42]*Id.*

[43]H-0379.

[44]H-0381.

[45]*Id.*

[46]H-0600.

[47]*Id.*

[48]*Id.*

[49]*Id.*

On February 9, 2004, Ms. Breese completed an additional functional assessment tool in order to provide the Hartford with an update on Plaintiff's condition.[50]   Ms. Breese noted that she had only recently "observed small changes for the better" in Plaintiff's condition, and she concentrated her treatment sessions on Plaintiff's efforts to overcome his anxiety and participate in social activities.[51]  Ms. Breese stated that, in her opinion, Plaintiff was not capable of performing full-time work as an attorney at that time.[52]

On February 12, 2004, Dr. Paine completed a functional assessment tool in order to provide the Hartford with an update on Plaintiff's condition.[53]  Dr. Paine noted that Plaintiff's condition had improved somewhat "in that he is trying and succeeding in socializing more and can concentrate better."[54]  Dr. Paine observed that Plaintiff seemed to be "more in touch with his underlying anger [and] that is helping his depression."[55]  In consideration of his examination of Plaintiff, Dr. Paine stated that, in his opinion, Plaintiff would not be "able to return to full-time work as a lawyer before another 1½ years."[56]

On February 17, 2004, Dr. Charles R. Billings, an orthopedic surgeon, conducted an

---

[50]H-0428.

[51]*Id.*

[52]*Id.*

[53]H-0443.

[54]*Id.*

[55]*Id.*

[56]*Id.*

initial physical examination of Plaintiff.[57]  Dr. Billings observed a "reduction in cervical spine range of motion with pain," and "[g]reater than ½ atrophy of the right brachium as compared to the left at 6 inches above the elbow."[58]  Dr. Billings obtained multiple radiographs of the cervical spine, including flexion extension lateral films.[59]  After examining the films, Dr. Billings noted that the "C4-5 and C5-6 interspaces reveal mild narrowing with anterior osteophyte formation present....  The C6-7 interspace appears narrowed with probable solid arthrodesis."[60]  In consideration of these findings, Dr. Billings stated that his "initial orthopedic impression was that of cervical spondylosis with prior anterior and posterior cervical procedures."[61]  According to Dr. Billings, and based upon Plaintiff's symptoms and history, "the accident of 10/01 produced post-traumatic exacerbation of his cervical disc and joint disease."[62]

On April 14, 2004, Dr. Daniel Johnson conducted an MRI of Plaintiff's cervical spine.[63] Dr. Johnson found evidence of multi-level spondylosis, degenerative narrowing at the C4-5 and 5-6 discs, and multiple herniated discs at the C3-4 and 4-5 discs.[64]  Dr. Johnson further reported

---

[57]H-0561.

[58]*Id.*

[59]*Id.*

[60]H-0562.

[61]*Id.*

[62]*Id.*

[63]H-0586.

[64]*Id.*

that the fusion at C6-7 did "not appear to be completely stable, as yet."[65]

On April 15, 2004, Dr. Morteza Shamsnia, a neurologist, conducted an EMG/Upper Extremity Nerve Conduction Study of Plaintiff's spine.[66] Dr. Shamsnia found evidence of chronic right C6, C7 radiculopathy, with mild right carpal tunnel syndrome.[67]

On May 10, 2004, Dr. Billings conducted a second examination of Plaintiff to follow up on his earlier diagnosis regarding "cervical disc disease with posttraumatic exacerbation."[68] Dr. Billings reviewed updated MRI films and found that the films were "consistent with adjacent segment disease."[69] In addition, Dr. Billings noted that Plaintiff "still has pain radiating [into his] right upper extremity, particularly when looking upward and to the right."[70] According to Dr. Billings, the updated MRI films and electromyography were consistent with Plaintiff's symptoms, as well as "early carpal tunnel syndrome right side."[71] Dr. Billings concluded that Plaintiff suffered from "cervical disc disease ... and adjacent segment disease," and recommended that Plaintiff was a probable surgical candidate but should continue to pursue nonoperative treatment pending the results of further testing.[72]

---

[65]*Id.*

[66]H-0583.

[67]*Id.*

[68]H-0560.

[69]*Id.*

[70]*Id.*

[71]*Id.*

[72]*Id.*

On July 21, 2005, Dr. Brandt Zimmer of Diagnostic Imaging Services reviewed updated MRI films of Plaintiff's cervical and lumbar spine areas.[73]  With respect to the images of Plaintiff's cervical spine, Dr. Zimmer found evidence of "degenerative changes of the cervical spine with potentially clinically significant foraminal stenosis on the left, especially at C4-C5.... There is also some spinal stenosis present at C4-C5 with no evidence of cord contact."[74]  Dr. Zimmer further noted "possible evidence of muscle spasm with straightening of the normal cervical lordosis, probably due to degenerative change as described."[75]  With respect to the images of Plaintiff's lumbar spine, Dr. Zimmer found evidence of "degenerative disc disease and posterior protrusion at T11-T12 with potential anterior cord abutment to the right of midline and resulting moderate spinal stenosis."[76]  In addition, Dr. Zimmer also noted "mild to moderate spinal stenosis present at L3-L4 due to disc and facet disease with no suggestion of nerve root impingement in the lumbar spine...."[77]

On August 8, 2005, approximately one week before his mental disability benefits were set to expire, Plaintiff appealed the Hartford's denial of his claim for physical disability benefits.[78]  In order to process Plaintiff's appeal, the Hartford retained Dr. Michael Weiss to

_____

[73]H-0558.

[74]*Id.*

[75]*Id.*

[76]*Id.*

[77]H-0559.

[78]H-0140.

perform an independent review of Plaintiff's medical records.[79] The Hartford gave Dr. Weiss the following instructions: (1) consider what, if any, functional limitations Plaintiff's submitted medical evidence supported from a physical standpoint; and (2) contact Plaintiff's treating physicians, specifically Dr. Charles Billings and Dr. Robert Miles, for additional information regarding Plaintiff's functional abilities and limitations.[80]

After reviewing the Plaintiff's medical records, Dr. Weiss concluded that the medical evidence Plaintiff had submitted did "not provide objective exam findings to support [Plaintiff's] subjective complaints of pain or to support the need for functional limitations."[81] Dr. Weiss did not examine the Plaintiff in person.[82] Although Dr. Weiss acknowledged that Plaintiff's most-recent MRI films showed evidence of ongoing spinal stenosis in the cervical area, he nevertheless concluded that "there is nothing from a functional standpoint and a physical standpoint that [Plaintiff] is unable to do."[83] According to Dr. Weiss, Plaintiff was able to "perform his activities of daily living and there is certainly nothing to suggest that he would be unable to perform any occupation."[84] Dr. Weiss did not, however, speak with either Dr. Billings or Dr. Miles. In fact, Dr. Weiss' report indicates that on September 12, 2005, at approximately 12:00 noon, Dr. Weiss placed one telephone call to Dr. Billings' office and one call to Dr. Miles'

---

[79]H-0400.

[80]*Id.*

[81]H-0404.

[82]*Id.*

[83]*Id.*

[84]*Id.*

office, and received busy signals from both numbers.[85]  Although Dr. Weiss reported that Dr.

Billings and Dr. Miles were "unavailable," there is no evidence that Dr. Weiss made any attempt

to contact either of them beyond placing the single telephone call to each.

On October 24, 2005, the Hartford denied Plaintiff's appeal.[86]  In reaching its decision,

the Hartford relied primarily on Dr. Weiss's letter opinion that "the medical records do not

provide findings to support [Plaintiff's] complaints of pain or to support the need for functional

limitations."[87]  The Hartford explained that:

> the medical documentation provided ... did not reveal evidence of
> functional impairments that would prevent you from performing the
> substantial and material duties of your regular occupation.  The
> records indicate that you are capable of performing activities of daily
> living independently and also that you have traveled abroad and
> suggest that you have also participated in other activities during the
> course of your claim.  The totality of the information available does
> not support that your condition would cause a functional impairment
> that would prevent you from performing your regular occupation
> from a physical standpoint.[88]

The Hartford further stated that Plaintiff had a right to submit additional medical evidence in

support of his claims if he wished to appeal the plan administrator's decision.[89]  Plaintiff

promptly appealed the second denial of his physical disability benefits and submitted additional

medical records for the Hartford to review, including updated MRI reports and letters from his

treating physicians.

---

[85]H-0402.

[86]H-0140.

[87]H-0142.

[88]*Id.*

[89]*Id.*

On June 13, 2006, Dr. Miles, Plaintiff's primary physician, wrote a letter report evaluating Plaintiff's condition, his progress over the course of his treatment, and his prospects for returning to employment.[90]  In his report, Dr. Miles stated:

> I have been [Plaintiff's] internist for the last 10 years.  I am well aware of his history of his spine surgeries and the subsequent pain and limitation he has had from those surgeries.  I have seen him on a regular basis since 1996, most recently on March 27, 2006.
>
> [Plaintiff] has been in chronic pain, primarily from his cervical spine disease.  He has been very limited in his physical activity and has been unable to read comfortably or sit at a desk and write for any length of time.  He has tried all modalities of treatment including consultations with physical medicine physicians, orthopedists, and neurosurgeons.
>
> I have handled most of [Plaintiff's] pain medications for the past few years and feel that he has a legitimate and continued need for these on a regular basis.  I do not feel he is able to work as an attorney because of his physical limitations.  I strongly believe that he would return to his occupation if he were at all physically able to do so.
>
> [Plaintiff's] pain and limitations are very real, and over the many years that I have known him I have had no reason to ever consider that he was malingering.  Had his disability insurance company, or [Dr. Weiss] contacted me, I would have been happy to share this information with them.[91]

Plaintiff submitted Dr. Miles' letter report to the Hartford in connection with his second appeal of the denial of his physical disability benefits.

On June 30, 2006, Dr. Billings wrote a letter report evaluating Plaintiff's condition, his progress over the course of his treatment, and his prospects for returning to employment.[92]  In his

---

[90]H-0309.

[91]H-0310.

[92]H-0311.

report, Dr. Billings stated:

> [Plaintiff] has been followed in this office regarding persistent neck pain with prior surgery. He has continued to suffer from persistent neck and upper extremity symptoms despite operative intervention.
>
> His last office visit was documented on 3/27/06, indicating decreased range of motion of the cervical spine as well as pain to palpation. New diagnostic studies were requested, including an MRI of the cervical and lumbar spine region. He remains [on] analgesics and anti-inflammatory agents.
>
> There is an approximate 35% permanent partial physical impairment of the cervical spine which translates to approximately 20% of the body as a whole. Regardless of the type treatment elected or the clinical course exhibited, there will be permanent restrictions in activities including prolonged sitting or standing as well as overhead work or work with arms extended.
>
> Based on his subjective complaints as well as physical and diagnostic study findings, his physical impairment is permanent and considering his occupational activities, he more likely than not will be unable to perform full time legal activities.[93]

Plaintiff submitted Dr. Billings' letter report to the Hartford in connection with his second appeal of the denial of his physical disability benefits.

In order to process Plaintiff's second appeal, the Hartford retained Dr. Robert Pick to perform an independent review of Plaintiff's medical records.[94] Dr. Pick did not examine Plaintiff in person, but he did review Plaintiff's medical records and spoke to Dr. Miles about Plaintiff's condition.[95] Dr. Miles stated that, in his opinion, Plaintiff could not do any prolonged sitting or writing; could not go back to work as a lawyer; had diminished range of motion;

---

[93]*Id.*

[94]H-0280.

[95]H-0278.

suffered from cervical and lumbar spine disease; and could not do any work comfortably.[96]

When asked if Plaintiff had showed any signs of atrophy, Dr. Miles stated that he could not

remember.[97]  Dr. Pick included a summary of the conversation in his report.[98]

On November 13, 2006, after reviewing Plaintiff's medical records and supplemental

evidence, Dr. Pick issued a report stating that, in his opinion, Plaintiff's "subjective symptoms

and complaints far exceed any objective findings noted."[99]  In particular, Dr. Pick found it

persuasive that there was no documentation of high impact or high velocity in relation to

Plaintiff's motor vehicle collision.[100]  According to Dr. Pick, the fact that Plaintiff had not gone

to the emergency room after the collision "underscores the limited nature and extent of that

event."[101]  In addition, Dr. Pick also noted as persuasive the fact that Dr. Billings had described

atrophy of Plaintiff's right brachium, "yet none of the other medical records, reports or

documents describe atrophy or muscle mass asymmetry."[102]  Dr. Pick noted that, during their

conversation, Dr. Miles could not remember whether Plaintiff suffered from atrophy.[103]  In

conclusion, Dr. Pick stated that Plaintiff's "described subjective symptoms and complaints have

---

[96]H-0279.

[97]H-0278.

[98]H-0285.

[99]H-0286.

[100]H-0287.

[101]*Id.*

[102]*Id.*

[103]*Id.*

not been objectively validated."[104]

On December 1, 2006, the Hartford denied Plaintiff's second appeal.[105]  In reaching its decision, the Hartford relied primarily on Dr. Pick's report.[106]  Although the Hartford acknowledged that "Dr. Miles continues to opine that [Plaintiff] has been in chronic pain, primarily from his cervical spine disease," the Hartford nevertheless concluded that Plaintiff's "subjective symptoms and complaints appear to far exceed any objective findings as reported by Dr. Pick."[107]  The Hartford also noted as persuasive the fact that Plaintiff was able to participate in "self-reported activities of daily living, which provides a picture of function in spite of any medical condition(s)."[108]

Shortly before the Hartford had denied Plaintiff's second appeal, the Social Security Administration's Administrative Law Judge had determined that Plaintiff was disabled and was eligible to collect social security benefits for his disability.[109]  The State Agency had previously recommended that Plaintiff was not disabled, but, after reviewing the medical evidence and the entire record, the Administrative Law Judge overruled the State Agency's recommendations, finding that Plaintiff was disabled and incapable of returning to work.  In finding that Plaintiff suffered from significant mental and physical functional limitations, the Administrative Law

---

[104]H-0287.

[105]H-0274.

[106]*Id.*  In order to obtain an unbiased opinion, the Hartford did not present Dr. Weiss's earlier report to Dr. Pick.

[107]H-0276.

[108]H-0276.

[109]See Rec. Doc. 29-3.

Judge explained that:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than the full range of sedentary work in that he is unable to maintain attention and concentration or to sustain a regular work schedule of 8 hours a day, 5 days a week.... After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, and that the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are generally credible...
>
> The claimant is unable to perform any past relevant work. The claimant has past relevant work as an attorney. This work would require a high degree of concentration and persistence; claimant would also be required to sustain a work schedule (court dates, filing deadlines, *et cetera*)....
>
> Considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform....
>
> The claimant has been under a disability, as defined in the Social Security Act, from May 17, 2003, through the date of this decision.[110]

Under the terms of the Hartford policy, the Hartford was entitled to offset any benefits it may owe to Plaintiff by the amount of benefits, if any, Plaintiff was entitled to recover from Social Security. As a result, the Hartford initially required Plaintiff to apply for Social Security disability benefits as early as 2003.[111] Shortly after the Administrative Law Judge issued his decision, Plaintiff's counsel forwarded the decision to the Hartford for inclusion in the administrative record. Because the Hartford had already denied Plaintiff's second appeal,

---

[110]*See* Rec. Doc. 29-3.

[111]H-0263; H-0410. Plaintiff later retained an attorney to represent him in the social security administration proceedings. H-0411.

however, the Hartford did not consider the decision in any way or otherwise include it in the administrative record.[112]

On March 27, 2007, Plaintiff filed suit against the Hartford for damages related to the denial of his physical disability claims under ERISA.[113] Plaintiff seeks both a reinstatement of past physical disability benefits and a declaration of rights to future benefits under 29 U.S.C. § 1132(a)(1)(B).[114] In addition, Plaintiff also seeks all reasonable attorney's fees and costs in connection with pursuing his claim. On May 18, 2007, the Hartford answered Plaintiff's complaint and filed a counterclaim seeking all reasonable attorney's fees and costs in connection with its defense of the action.[115]

On April 2, 2007, Plaintiff had updated MRIs taken of his right shoulder, cervical spine, and lumbar spine.[116] Dr. Bruce Knox reviewed the MRIs of Plaintiff's right shoulder and cervical spine, and Dr. Scott Mills reviewed the MRIs of Plaintiff's lumbar spine.[117] With regards to Plaintiff's right shoulder, Dr. Knox found evidence of "severe degenerative changes of the glenoid labra," with a partial thickness articular surface tear of the distal supraspinatus

_____

[112]The parties dispute whether the Court may consider this evidence in reaching its decision, because the Administrative Law Judge's opinion is not included in the administrative record.

[113]*See* Rec. Doc. 1.

[114]*See* Rec. Doc. 1.

[115]*See* Rec. Docs. 5, 6, 7.

[116]H-0203.

[117]*Id.*

tendon.[118]  Dr. Knox found that the MRIs of Plaintiff's cervical spine showed: (1) disc bulging

and broad-based protrusion at C3-4; (2) broad-based disc osteophyte at C4-5 with cord abutment,

central canal narrowing, and left neural canal narrowing; (3) broad-based disc osteophyte disc

complex at C5-6 with central canal narrowing and bilateral neural canal narrowing; (4) minimal

broad-based right paracentral disc protrusion at C6-7 with mild central canal narrowing and left

neural canal narrowing; and (5) left neural canal narrowing at C7-T1 secondary to uncinate and

facet hypertrophy.[119]  Interpreting the MRIs of Plaintiff's lumbar spine, Dr. Mills found a broad-

based disc bulge at T11-12 with mild central canal stenosis, flattening of the thoracic cord, and

articular facet degeneration at L3-4 and L4-5.[120]

On June 22, 2007, Plaintiff filed a motion to remand the proceedings back to the plan

administrator so that Plaintiff could present evidence of the updated MRI results to the Hartford

in order to pursue a final administrative appeal.[121]  On September 13, 2007, the Court granted

Plaintiff's motion to remand the proceedings to the Hartford for a final administrative appeal,

providing that either party could petition to reopen the case at a later date for good cause

shown.[122]

In addition to supplying the Hartford with the updated MRI reports, Plaintiff also

submitted the results of a Functional Capacity Evaluation performed by Courtney L. Roberts,

---

[118]*Id.*

[119]H-0205, H-0206.

[120]H-0207.

[121]*See* Rec. Doc. 10.

[122]*See* Rec. Doc. 17.

PT, DPT.[123]  On February 12, 2008, Ms. Roberts issued a report detailing the results of the functional capacity evaluation that she performed on Plaintiff.[124]  After evaluating Plaintiff for a period of 4.5 hours over two days, Ms. Roberts found that Plaintiff "does not meet the full criteria for sedentary work."[125]  Ms. Roberts observed that Plaintiff had "impairments of the cervical; upper thoracic; lumbar spine; and bilateral upper extremities."[126]  Specifically, Ms. Roberts noted that Plaintiff's "lumbar pain is progressively worsening with radicular symptoms into the bilateral lower extremities with muscle spasms in the lumbar musculature."[127]  Ms. Roberts also noted that Plaintiff had significant difficulty sitting for any significant period of time.[128]  In light of these findings, Ms. Roberts concluded that Plaintiff would be unable to meet the requirements for sedentary work because of "decreased sitting tolerance; decreased tolerance with forward flexion activity of the head and neck; decreased endurance; decreased balance; decreased strength; and increased pain with tasks."[129]

In order to process Plaintiff's final administrative appeal, the Hartford retained Dr. Suresh Mahawar to review Plaintiff's medical records.  On March 28, 2008, Dr. Mahawar issued a report finding that Plaintiff was not disabled and "should have been capable to work in a

---

[123]H-0087.

[124]H-0088.

[125]*Id.*

[126]*Id.*

[127]*Id.*

[128]*Id.*

[129]*Id.*

sedentary occupation."[130]  In his report, Dr. Mahawar states that he did not examine Plaintiff in person, did not have Plaintiff's entire medical record available to him, and was unable to contact Plaintiff's treating physicians prior to issuing the report.[131]  Nevertheless, Dr. Mahawar concluded that Plaintiff's subjective complaints were not supported by objective medical evidence.[132]  For example, Dr. Mahawar dismissed Dr. Miles' opinion that Plaintiff was unable to work due to physical limitations, citing an earlier report by Dr. Pick indicating that Dr. Miles had previously stated in conversation that he could not remember whether Plaintiff suffered from muscle atrophy.[133]  Similarly, Dr. Mahawar dismissed Ms. Robert's functional capacity evaluation on the grounds that Plaintiff's poor sitting tolerance "could not be explained on a medical basis" and Ms. Roberts had not indicated whether Plaintiff suffered from objective conditions such as muscle atrophy.[134]  In consideration of the admittedly limited medical records that he reviewed and without examining Plaintiff in person or speaking to his treating physicians, Dr. Mahawar concluded that Plaintiff should be able to perform sedentary work and "should be able to sit for 8 hours a day with regular breaks."[135]

On April 18, 2008, the Hartford denied Plaintiff's third and final administrative appeal.

_____

[130]H-0082.

[131]*Id.*

[132]*Id.*

[133]H-0081.  Unlike Dr. Pick, Dr. Mahawar was apparently permitted to review the previous independent medical evaluations, including Dr. Pick's report or notes, prior to issuing his own report.

[134]*Id.*

[135]H-0082.

In reaching its decision, the Hartford relied primarily on Dr. Mahawar's report.  The Hartford explained that "the evidence does not support that [Plaintiff] has been physically impaired to the degree that would prevent him from performing the material and substantial duties of his regular sedentary occupation as that of an attorney."[136]  According to the Hartford, there was "overwhelming evidence including three independent Medical Record Reviews that indicate [Plaintiff] is capable of functioning physically at a level consistent with sedentary work, such as that of his own occupation."[137]  In addition to the Medical Record Reviews, however, the Hartford also noted as particularly persuasive the fact that Plaintiff's profile page was still included on his firm's website.[138]  Although the Hartford acknowledged that the mere existence of the profile page did not necessarily mean that Plaintiff was practicing as an attorney at that time, the Hartford nevertheless counted the existence of the profile page was persuasive evidence against Plaintiff's claim.[139]  Specifically, the Hartford noted that "[t]here is nothing on the firm's website that suggests that [Plaintiff] is or is no longer active in the day to day operation of the firm other than the fact that he is listed as shareholder and featured on the website as one of the firm's attorneys."[140]

On April 22, 2008, Plaintiff filed a motion to reopen the case on the grounds that the

---

[136]H-0062.

[137]*Id.*

[138]*Id.*

[139]*Id.*

[140]*Id.*

parties had concluded the administrative proceedings.[141]  On July 11, 2008, the Court granted the motion, reopened the case, and set the matter for trial on the administrative record.[142]

## II.     LAW & ANALYSIS

### A.     Standard of Review

Federal courts have exclusive jurisdiction to review determinations made by employee benefit plans, including disability benefit plans.  29 U.S.C. § 1132(a)(1)(B).  "[A] denial of benefits challenged under § 1132(a)(1)(B) is generally reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 389 U.S. 101, 115 (1989).  "[W]hen an administrator has discretionary authority with respect to the decision at issue, the standard of review should be one of abuse of discretion."  *Vega v. Nat. Life Ins. Services, Inc.*, 188 F.3d 287, 295 (5th Cir. 1999).

In the instant case, Plaintiff's disability plan provides the plan administrator–the Hartford–with discretion to determine benefit eligibility.  Accordingly, the Court will apply an abuse of discretion standard to its review of the plan administrator's decision.  Under this deferential standard, a plan fiduciary's determination will be upheld so long as it is "supported by substantial evidence and is not arbitrary and capricious."  *Corry v. Liberty Life Assur. Co. of Boston*, 499 F.3d 389, 397-98 (5th Cir. 2007).  The Fifth Circuit has explained that "[s]ubstantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Ellis v. Liberty Life*

---

[141]*See* Rec. Doc. 18.

[142]*See* Rec. Doc. 22.

*Assurance Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004). A plan administrator's discretionary decision may be overturned only if it is arbitrary and capricious, or, in other words, if it is made "without a rational connection between the known facts and the decision or between the found facts and the evidence." *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 214 (5th Cir. 1999).

Under the terms of Plaintiff's disability plan, the Hartford both makes eligibility determinations and pays benefits to claimants based on those determinations. In *Metropolitan Life Insurance Company v. Glenn*, the Supreme Court recently held that such a dual role creates a conflict of interest "that a reviewing court should consider ... as a factor in determining whether the plan administrator has abused its discretion in denying benefits." 128 S.Ct. at 2346. This inherent conflict of interest arises whenever a single company acts as both insurer and plan administrator, because "every dollar provided in benefits is a dollar spent by ... the employer; and every dollar saved ... is a dollar in [the employer's] pocket." *Id.* at 2348. The Supreme Court laid down no precise standard for making this determination, finding it unnecessary "to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict." *Id.* at 2351. Rather, as the Fifth Circuit has explained, a reviewing court considering such a conflict is merely "less likely to make forgiving inferences when confronted with a record that arguably does not support the administrator's decision." *Vega*, 188 F.3d at 298. The extent to which the reviewing court takes such a conflict into consideration, however, will likely depend on the circumstances of the individual case. *Id.*

**B.      The Administrative Record**

Regarding what evidence this Court may review in evaluating the plan administrator's

decision, "when assessing factual questions, the district court is constrained to the evidence before the plan administrator." *Vega*, 188 F.3d at 299. A court may not "stray from the [administrative record] but for certain limited exceptions, such as the admission of evidence related to how an administrator has interpreted terms of the plan in other instances, and evidence, including expert opinion, that assists the district court in understanding the medical terminology or practice related to a claim." *Bratton v. Nat'l Union Fire Ins. Co.*, 215 F.3d 516 (5th Cir. 2000). Nevertheless, for purposes of this Court's review, the administrative record consists of all "relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." *Vega*, 188 F.3d at 300. As the Fifth Circuit has explained,

> [b]efore filing suit, the claimant's lawyer can add additional evidence to the administrative record simply by submitting it to the administrator in a manner that gives the administrator a fair opportunity to consider it. In *Moore*, we said that 'we may consider only the evidence that was available to the plan administrator in evaluating whether he abused his discretion in making the factual determination.' If the claimant submits additional information to the administrator, however, that additional information should be treated as part of the administrative record. Thus, we have not in the past, nor do we now, set a particularly high bar to a party's seeking to introduce evidence into the administrative record.... [I]n restricting the district court's review to evidence in the record, we are merely encouraging attorneys for claimants to make a good faith effort to resolve the claim with the administrator before filing suit in district court....

*Id.* The court may therefore consider relevant evidence if it was made available to the plan administrator prior to the plaintiff's filing suit and was presented in such a way as to afford the plan administrator a fair opportunity to consider the evidence. *Id.*

In the instant case, the parties dispute whether the Court may consider the decision of the

Social Security Administration's Administrative Law Judge that Plaintiff is disabled and eligible to recover benefits. On January 30, 2007, prior to filing suit, Plaintiff's counsel forwarded a copy of the decision to the Hartford. The Hartford argues that it did not receive the documents, and, even if it did receive the documents, it was not required to include them in the administrative record at that time because the administrator had previously resolved Plaintiff's second appeal. Later, when this matter was remanded to the Hartford for a final administrative appeal, the Hartford did not directly notify Plaintiff that he had to resubmit the information in order for it to be considered. In light of the Fifth Circuit's instruction that there is no "particularly high bar to a party's seeking to introduce evidence in the administrative record," the Court finds that the Social Security Administration's decision is properly considered part of the administrative record for purposes of this Court's review. Although decided under a different standard from that of the Hartford policy, the Social Security Administration's ruling was the culmination of a closely-related proceeding having a direct bearing on the outcome of Plaintiff's disability claims with the Hartford. Indeed, the Hartford initially required Plaintiff to pursue Social Security benefits so that it could potentially use those benefits to offset any amounts that it might be required to pay. The Hartford had "a fair opportunity to consider" the Administrative Law Judge's ruling but failed to do so and did not include the decision in the administrative record.

In considering the Social Security Administration's decision, however, the Court is mindful that the ruling is merely one factor in the Court's overall analysis and is by no means dispositive of the underlying dispute. For example, it is worth noting that the standards for determining disability under the Social Security requirements vary considerably from the

standards for determining disability under the Hartford policy.  *See Hammond v. UNUM Life Ins. Co. of Am.*, Civ. A. No. 05-632, 2008 WL 906522, at *11 (S.D. Miss. Mar. 31, 2008) ("[E]ntitlement to Social Security benefits is measured by a uniform set of federal criteria, but a claim for benefits under an ERISA plan often turns on the interpretation of plan terms that differ from SSA criteria.... [T]he determination that a claimant suffers from a disability under Social Security regulations does not require an ERISA plan administrator to reach the same conclusion.").  Nevertheless, the determination that Plaintiff is entitled to recover Social Security benefits for his disability is at least relevant to the instant dispute and should be considered.  *See Gellerman v. Jefferson Pilot Fin. Ins. Co.*, 376 F. Supp. 2d 724, 735 (S.D. Tex. 2005) (noting that "no court has held that an SSA determination is completely irrelevant" to an appeal under ERISA).  "Although Social Security determinations are not binding upon plan administrators, they are 'relevant and instructive' in a court's determination of whether a plan administrator acted arbitrarily or capriciously."  *Schexnayder v. CF Industries Long Term Disability Plan*, 553 F. Supp. 2d 658, 664 (M.D. La. 2008).

**C.      Was the Plan Administrator's decision to deny Plaintiff benefits an abuse of discretion?**

The Hartford disability policy states that

> "'Disability' means that Injury or Sickness causes physical or mental impairment to such a degree of severity that You are:
>
> 1.      continuously unable to perform the Material and Substantial Duties of Your Regular Occupation; and
>
> 2.      not working for wages in any occupation for which You are or become qualified by education, training or experience and which provides You with substantially the same earning capacity as Your former earning capacity prior to the start of

-31-

Your Disability.[143]

In order to recover benefits, an applicant must submit appropriate "Proof of Disability," which includes but is not limited to "objective medical findings which support [the] disability."[144]  The Hartford policy provides the following non-exhaustive list of "objective medical evidence": "tests, procedures, or clinical examinations standardly accepted in the practice of medicine, for [the] disabling condition."[145]  Plaintiff does not argue that the Hartford misinterpreted the policy, but rather that the Hartford's denial of his claim for physical disability benefits amounted to an abuse of the plan administrator's discretion.

In denying Plaintiff's claim for disability benefits, the Hartford found that Plaintiff's subjective complaints of debilitating back and neck pain were not supported by "objective medical evidence" as required by the terms of the plan.  For example, Dr. Weiss stated that Plaintiff's medical records did "not provide objective exam findings to support [his] subjective complaints of pain or to support the need for functional limitations"[146];  Dr. Pick found that Plaintiff's "subjective symptoms and complaints far exceed any objective findings noted"[147]; and Dr. Mahawar concluded that Plaintiff should be able to return to work as an attorney because the test results indicating that he was unable to sit for long periods of time "could not be explained

---

[143]H-0014.

[144]H-0020.

[145]*Id.*

[146]H-0404.

[147]H-0286.

on a medical basis."[148]

Plaintiff disputes the Hartford's findings and argues that the Hartford's physicians arbitrarily disregarded objective medical evidence in the record because they were acting under a conflict of interest. Specifically, Plaintiff notes that the Hartford's physicians never examined him in person and only one of the Hartford's physicians ever spoke to one of his treating physicians. Plaintiff contends that his complaints of pain and functional limitation are supported by extensive objective medical evidence in the record, such as MRI reports, a cervical myelogram, a Functional Capacity Evaluation, and two unsuccessful spinal surgeries. In further support of his argument, Plaintiff points to the Social Security Administration's decision finding that he is disabled and, as a result, eligible to collect benefits under the terms of that program.

As an initial matter, the Court notes that disabilities of the spine causing significant pain have been the basis for several ERISA claims within this circuit. For example, in *Schexnayder v. CF Industries Long Term Disability Plan*, the plaintiff sought disability benefits under his employer's ERISA plan for a back injury that prevented him from returning to work. 553 F. Supp. 2d at 660. Relying on the findings of its own retained physicians, the employer's plan administrator (the Hartford), had denied benefits because it found plaintiff's "complaints of pain to be subjective and 'not consistent' with the objective findings." *Id.* at 666. The district court disagreed, finding that the plaintiff's subjective complaints of pain were corroborated by substantial objective medical evidence, including, in particular, an MRI revealing that plaintiff suffered from "laminectomary and significant stenosis in the lumbar spine." *Id.* After reviewing the entire medical record, the district court reversed the denial of benefits on the grounds that the

---

[148]H–0081.

plan administrator had "abused its discretion in discounting the subjective evidence of [p]laintiff's pain and the objective evidence corroborating the disability." *Id.* at 667. As the court explained, "[a]lthough pain cannot always be objectively quantified, the [plaintiff's] pain is corroborated by medical evidence finding degenerative disc disease and spinal stenosis and notations of pain... The [plan administrator] abused its discretion in discounting the subjective evidence of [plaintiff's] pain and the objective evidence corroborating the disability." *Id.* Although the plan administrator was free to offer credible evidence refuting the plaintiff's subjective complaints of plain, it had abused its discretion in part because it had simply failed to consider the plaintiff's reported symptoms. *Id.* As the court stated, a claimant's "[a]ccounts of pain cannot be ignored." *Id.*

Similarly, in *Burdett v. Unum Life Insurance Company of America*, No. 06-6138, 2008 WL 4469094 (E.D. La. Sept. 30, 2008), the district court reversed a plan administrator's denial of physical disability benefits under ERISA in part because the administrator had reached its decision by relying exclusively on the opinions of its own physicians, none of whom had ever treated the plaintiff in person. In addition, the plan administrator had simply disregarded as unreliable the opinions of the plaintiff's treating physicians. *Id.* As the court in *Burdett* explained:

> In stacking the evidence, [p]laintiff has presented objective medical evaluations that confirm her condition and pain that she is experiencing. She provided proof of medical tests, including an MRI, an EMG, and a lumbar myelogram, all of which confirmed that [p]laintiff suffered from objective disabilities. She also provided proof of surgeries that were designed to alleviate her condition, although they were not entirely successful and resulted in further complications, including a spinal leak.

*Id.* at * 11. In finding that the plan administrator had abused its discretion in denying benefits,

the court also noted as persuasive two additional factors: first, that the Social Security Administration had granted the plaintiff disability benefits; and second, that the plan administrator was acting under an inherent conflict of interest because it both determined eligibility and paid benefits based on those determinations. *Id.* The court noted that the plan administrator's almost wholesale disregard for the opinions of plaintiff's treating physicians suggested the presence of an increased level of bias, thus warranting the application of a slightly less deferential standard in the court's review of the benefits denial. *Id.*

In the instant case, the Hartford denied Plaintiff's claims for physical disability benefits because it found that Plaintiff's subjective complaints of pain were not supported by objective medical evidence. Over the course of Plaintiff's several appeals, however, Plaintiff has submitted a considerable amount of objective medical evidence in support of his physical disability, functional limitations, and subjective complaints of pain:

| Medical Procedure | Positive Findings |
|---|---|
| 1998 Cervical MRI | Multi-level degenerative disc disease |
| 2000 Cervical MRI | Multi-level degenerative disc disease |
| 2000 Cervical Fusion Surgery at C6-7 | Repair of herniated disc and stenosis |
| 2002 Lumbar MRI | Multi-level degenerative disc disease and stenosis |
| 2002 Lumbar Epidural Steroid Injection | Treatment for disc disease |
| 2002 Cervical Epidural Steroid Injection | Treatment for disc disease |
| 2002 Cervical MRI | Multi-level disc disease, radiculopathy, and spondylothesis |
| 2002 Cervical Myelogram/CAT | Disc herniation and stenosis |

| | |
|---|---|
| 2002 Laminotomy and Foraminotomy at C6-7 | Repair of disc disease and stenosis |
| 2004 Cervical MRI | Multi-level disc herniations, stenosis, nerve root impingement, muscle spasm, loss of lordotic spinal curve |
| 2005 Lumbar MRI | Multi-level facet and disc disease, disc protrusion, spinal cord abutment |
| 2007 Cervical MRI | Multi-level disc herniations and spinal cord abutment |
| 2007 Shoulder MRI | Partially torn distal supraspinatus tendon, degenerative arthritic change in AC joint with impingement |
| 2007 Lumbar MRI | Multi-level disc disease, stenosis, spinal cord impingements |
| 2008 Functional Capacity Examination | Muscle spasms, disabled, unable to return to work |

After an exhaustive review of the administrative record, the Court finds that the overwhelming evidence supports the conclusion that Plaintiff suffers from chronic back and neck pain rendering him unable to sit or concentrate for extended periods of time. Dr. Miles, Plaintiff's longstanding physician, explained that, due to Plaintiff's chronic back and neck pain, he is "unable to read comfortably or sit at a desk and write for any length of time.... I do not feel he is able to work as an attorney because of his physical limitations."[149] Similarly, Dr. Billings concluded that, "[b]ased on his subjective complaints as well as physical and diagnostic study findings, [Plaintiff's] physical impairment is permanent and considering his occupational activities, he more likely than not will be unable to perform full time legal activities."[150] Further,

---

[149]H-0310.

[150]*Id.*

Ms. Roberts, who performed Plaintiff's Functional Capacity Evaluation, determined that he was unable to do sedentary work because of his chronic pain, which, according to Ms. Roberts, appeared to be progressively worsening.

The Hartford contends that its discretionary decision should be upheld in part because it hired numerous independent physicians to review Plaintiff's medical records, all of whom individually determined that Plaintiff's subjective complaints of pain were not supported by objective medical evidence. The Court is not persuaded. As an initial matter, the Court notes that none of the Hartford physicians ever examined Plaintiff in person; indeed, only one of the Hartford phyisicans ever even spoke to a single one of Plaintiff's treating physicians. For example, before determining that Plaintiff was capable of returning to work as an attorney full-time, Dr. Mahawar: (1) did not examine Plaintiff in person or otherwise correspond with Plaintiff in any way; (2) did not discuss Plaintiff's condition with any of his treating physicians; and (3) admittedly reviewed only selected portions of Plaintiff's medical records. And although Dr. Weiss stated in his report that Plaintiff's treating physicians were "unavailable" to discuss his condition, the Court questions how seriously Dr. Weiss would have considered their findings even if he had the benefit of their opinions, especially given that his total efforts to consult with them consisted of a single noontime telephone call to each office, after which he apparently never attempted to contact them again. Despite having such limited contact–and indeed, in many instances, no contact at all–with either Plaintiff or his treating physicians, each of the Hartford physicians readily dismissed Plaintiff's complaints of pain as well as the numerous consistent findings of his treating physicians as lacking support in objective medical evidence. But "although there is no treating physician preference in the ERISA context, an administrator may

not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of treating physicians." *Schexnayder,* 553 F. Supp. 2d at 666 (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003)).

In addition, neither the Hartford nor its physicians ever credited Plaintiff's numerous accounts of pain, even when those accounts were verified by his treating physicians. For example, Ms. Roberts conducted a Functional Capacity Evaluation of Plaintiff and noted that Plaintiff suffered from progressively worsening lumbar pain with muscle spasms and an inability to tolerate sitting for extended periods of time. Rather than addressing the import of Ms. Roberts' findings, Dr. Mahawar simply discounted the results of the Functional Capacity Evaluation in conclusory fashion because: (1) he felt that the results "could not be explained on a medical basis"; and (2) Ms. Roberts had not indicated whether Plaintiff suffered from objective conditions such as muscle atrophy.[151] Dr. Mahawar did not explain how the muscle spasms that Ms. Roberts observed failed to constitute an "objective condition"; nor did he consider Plaintiff's numerous recorded complaints of pain during the course of the evaluation. *See Schexnayder*, 553 F. Supp. 2d at 666-67 (holding that the Hartford, as plan administrator, had abused its discretion in failing to consider the fact that plaintiff "was in considerable pain during the [functional capacity] evaluation"). Although pain cannot often be objectively quantified, "[a]ccounts of pain cannot be ignored." *See id.* at 667; *see also Lain v. Unum Life Ins. Co. of Am.*, 279 F.3d 337, 347 (5th Cir. 2002) (holding that plan administrator abused its discretion in denying disability benefits in part because administrator "failed to take into account that [plaintiff's] chest pains cannot be clinically measured by tests"; and explaining that "[t]o focus

---

[151]H-0082.

on the tests, rather than the pain and its effect, further indicates [the administrator's] abuse of discretion").

The Hartford's determination that Plaintiff failed to submit sufficient "objective medical evidence" in support of his claim for benefits rings hollow, especially given that the Hartford and its physicians readily credited arbitrary or inconclusive evidence in finding that Plaintiff was not disabled. On the one hand, the Hartford refused to acknowledge that evidence such as Plaintiff's cervical myelogram, numerous MRI reports, multiple failed surgeries, CAT scan, and Functional Capacity Evaluation constituted sufficiently credible "objective medical evidence" of a disability; on the other hand, however, the Hartford readily noted as persuasive such inconclusive and arbitrary evidence as the fact that Plaintiff's profile page appeared on his firm's website. Despite acknowledging that the mere existence of the profile page did not establish that Plaintiff was at that time either working as an attorney or capable of working as an attorney, the Hartford nevertheless counted the profile page as persuasive evidence against Plaintiff's claim for disability benefits. Indeed, the record is replete with comparable instances in which either the Hartford or its physicians summarily disregarded objective medical evidence by focusing on a single piece of information taken out of context. For example, Dr. Miles, Plaintiff's longstanding physician, had advised Dr. Pick that, in his opinion, Plaintiff could not do any prolonged sitting or writing; could not go back to work as a lawyer; had diminished range of motion; suffered from cervical and lumbar spine disease; and could not do any work of any kind comfortably. Dr. Pick completely disregarded Dr. Miles' opinion, however, based largely on the sole fact that, during their conversation, Dr. Miles could not remember whether Plaintiff suffered

from muscle atrophy.[152]  A similar example is how Dr. Pick summarily rejected the opinions of several treating physicians that Plaintiff's automobile accident had exacerbated his previous injury. According to Dr. Pick, the fact that Plaintiff had not gone to the emergency room immediately following the collision was dispositive; that fact alone was apparently sufficient to persuade Dr. Pick that the accident had been a minor one without any potential long-term effect on Plaintiff's condition.  Indeed, the Hartford's inconsistent and arbitrary methodology ultimately transformed the Plaintiff's numerous appeals into a sort of Kafkaesque trial in which "objective medical evidence" was an elusive and constantly shifting requirement that could not possibly be met, no matter how many medical tests, MRIs, or Functional Capacity Evaluations Plaintiff submitted in support of his claim.  In light of the Hartford's dual role as plan administrator and payor, the Hartford's arbitrary methodology in processing Plaintiff's claim supports a finding that the Hartford acted in this instance with significant bias, thus warranting a somewhat less deferential standard in this Court's review of its decision.

In addition, the Court also finds persuasive the fact that the Social Security Administration granted Plaintiff's claim for disability benefits.  As an initial matter, as previously mentioned, it is recognized that disability adjudications by the Social Security Administration are determined according to a different standard from ERISA determinations. *See Hammond v. Unum Life Ins. Co.*, Civ. A. No. 05-632, 2008 WL 906522, at *11 (S.D. Miss. Mar. 31, 2008) ("Differences between the Social Security disability program and ERISA benefits plans caution against importing standards from the first into the second.").  Nevertheless, the

---

[152]Perhaps not surprisingly, Dr. Pick did not attempt to schedule a follow-up conversation with Dr. Miles to afford Dr. Miles an opportunity to refresh his recollection and clarify Plaintiff's medical history.

Social Security Administration's decision that Plaintiff is entitled to recover disability benefits, while only a single factor in the Court's overall analysis, is at least persuasive evidence of Plaintiff's condition and should be considered. In particular, it is persuasive that the Administrative Law Judge found that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, and that the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are generally credible."[153] In addition, the Administrative Law Judge further noted that Plaintiff would be unable to return to work as an attorney in any capacity because he was incapable of concentrating or focusing adequately in order to perform his fundamental job duties.[154] In light of the overwhelming objective medical evidence in the administrative record in this proceeding, this Court agrees that Plaintiff's complaints of debilitating pain are credible and will prevent him from returning to work as an attorney in any capacity for any length of time. Plaintiff's chronic neck and back pain, the apparent result of a combination of trauma and severe degenerative disc disease, will constantly distract his attention. Even if he takes medication to relieve the pain, however, Plaintiff's medication will dull his concentration, thus making it virtually impossible for him to process the lengthy and complex legal issues that, as an attorney, he dealt with regularly prior to his disability.

In conclusion, after conducting an extensive review of the administrative record, the Court finds that the Hartford abused its discretion in denying Plaintiff's claim for physical disability benefits. The record is replete with objective medical evidence supporting Plaintiff's

---

[153]*See* Rec. Doc. 29-3.

[154]*Id.*

complaints of chronic and debilitating back and neck pain. Numerous physicians, both treating

and non-treating, have interpreted the objective medical evidence as supporting Plaintiff's

reported symptoms. For example:

> - Dr. Miles concluded that Plaintiff "has been very limited in his physical activity and has been unable to read comfortably or sit at a desk and write for any length of time.... has tried all modalities of treatment including consultations with physical medicine physicians, orthopedists, and neurosurgeons"[155];

> - Dr. Billings reported that Plaintiff would more likely than not be unable to return to work as an attorney because of his severe degenerative disc disease, resulting in an inability to tolerate prolonged sitting or standing, as well as "an approximate 35% permanent partial physical impairment of the cervical spine which translates to approximately 20% of the body as a whole"[156];

> - Dr. Zimmer interpreted MRI films of Plaintiff's cervical and lumbar spine areas and found evidence of degenerative changes, spinal stenosis, and muscle spasms;[157]

> - Dr. Shamsnia conducted an EMG/Upper Extremity Nerve Conduction Study of Plaintiff's spine and found evidence of chronic right C6, C7 radiculopathy;[158]

> - Dr. Knox reviewed MRI films of Plaintiff's right shoulder and found evidence of severe degenerative changes and a partial thickness articular surface tear;[159]

> - Dr. Mills reviewed MRI films of Plaintiff's lumbar spine, which revealed evidence of stenosis, flattening of the thoracic cord, and

---

[155]H-0310.

[156]H-0311.

[157]H-0558.

[158]H-0583.

[159]H-0203.

articular facet degeneration;[160]

- Ms. Roberts completed a Functional Capacity Evaluation on Plaintiff and noted progressively worsening lumbar pain and muscle spasms, leading her to conclude that Plaintiff was disabled and would be incapable of returning to work as an attorney;[161] and

- the Social Security Administration's Administrative Law Judge concluded that Plaintiff would be unable to return to work as an attorney because "he is unable to maintain attention and concentration or to sustain a regular work schedule," and that his "medically determinable impairments could reasonably be expected to produce the alleged symptoms."[162]

Presented with such overwhelming objective medical evidence of Plaintiff's disability, the Hartford instead relied on selective, inconclusive and arbitrary facts in determining that the record evidence failed to support Plaintiff's reported symptoms. *See Vega*, 188 F.3d at 302 ("Plainly put, we will not countenance a denial of a claim solely because an administrator suspects something may be awry. Although we owe deference to an administrator's reasoned decision, we owe no deference to an administrator's unsupported suspicions."). Under the terms of the plan at issue, the Hartford both determines eligibility and pays benefits based on those determinations, thus giving rise to an inherent conflict of interest. Given its dual role as both administrator and payor, the Hartford's consistent refusal to credit objective medical evidence in favor of arbitrary and inconclusive facts taken out of context reveals a significant level of bias in this proceeding. Applying a somewhat less deferential standard of review to the Hartford's denial of benefits, the Court finds that the Hartford abused its discretion in denying Plaintiff's

---

[160]H-0207.

[161]H-0087.

[162]*See* Rec. Doc. 29-3.

claim for physical disability benefits.  As a result, the Hartford's decision will be reversed and Plaintiff's benefits will be reinstated.

### D.    Attorney's Fees

"ERISA provides that 'in any action under this subchapter ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  *Wade v. Hewlett-Packard Development Co. LP Short Term Disability Plan*, 493 F.3d 533, 541-42 (5th Cir. 2007) (quoting 29 U.S.C. § 1132(g)(1)).  The award of attorney's fees depends on the facts of each case.  As the Fifth Circuit has explained:

> The following five factors [are] enumerated for consideration in ERISA cases when shifting attorney's fees: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' position.

*Id.* at 542 n. 6 (quoting *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir. 1980)).

After reviewing the evidence and the entire record, the Court finds that an award of attorney's fees to Plaintiff is appropriate in this case.  The Hartford deliberately ignored overwhelming objective medical evidence supporting Plaintiff's complaints of chronic and debilitating back and neck pain.  Although none of the Hartford's physicians ever examined Plaintiff in person and only one ever spoke to any of Plaintiff's treating physicians, the Hartford's physicians nevertheless summarily dismissed Plaintiff's complaints of pain as well as the numerous supporting opinions of his treating physicians.  Further, in concluding that the

Plaintiff was not disabled, the Hartford not only disregarded considerable objective medical evidence, but it also relied heavily on inconclusive and irrelevant evidence such as, *inter alia*, the fact that Plaintiff's profile page appeared on his firm's website. Hartford's denial of coverage results from its preferential and predetermined conclusions. *Schexnayder*, 553 F. Supp. 2d at 667 (awarding attorneys' fees where the administrator "scoured the record for evidence consistent with the outcome which was most financially beneficial for itself."). Additionally, there is no evidence to suggest that the Hartford would be unable to afford the payment of reasonable attorney's fees. Finally, awarding attorney's fees in this case is likely to serve a significant deterrent function for the Hartford and other insurers in similar situations. *Servat v. Am. Heritage Life Ins. Co.*, Civ A. No. 04-2928, 2007 WL 2480342, at *21 (E.D. La. Aug. 28, 2007) ("[R]endering an award of attorney's fees in this case may cause other insurers to improve upon similar claim review processes to the benefit of many insureds."). Accordingly, the Court will award attorney's fees to the Plaintiff.

In order to determine the amount of attorney's fees that are reasonable in this case, Plaintiff is directed to submit, in writing, an accounting of the attorney's fees expended along with a memorandum supporting this claim no later than Monday, July 13, 2009. Objections by the Defendant, if any, shall be filed no later than Monday, July 20, 2009. Thereafter, a status conference shall be convened to discuss the appropriate method of resolving this aspect of the case.

## III. CONCLUSION

For the foregoing reasons, the Court finds in favor of Plaintiff and reverses the plan administrator's decision as an abuse of discretion. Accordingly, IT IS ORDERED that

Plaintiff's past and future physical disability benefits shall be reinstated.  IT IS FURTHER

ORDERED Plaintiff's claims for attorney's fees are GRANTED, subject to the additional

briefing schedule set forth in this order.

New Orleans, Louisiana, this 29th day of June, 2009.

_____
UNITED STATES DISTRICT JUDGE